1997 ME 77

**STATE of Maine,**

v.

**Ruth F. WITHAM.**

Supreme Judicial Court of Maine.

Argued Oct. 9, 1996.

Decided April 16, 1997.

R. Christopher Almy, District Attorney, Jeffrey M. Silverstein, Asst. Dist. Atty. (orally), Bangor, ME, for State.

James C. Munch, III (orally), Marvin R. Glazier, Vafiades, Brountas & Kominsky, Bangor, ME, for defendant.

Before WATHEN, C.J., and GLASSMAN, CLIFFORD, DANA and LIPEZ, JJ.

LIPEZ, Justice.

[¶ 1] Ruth F. Witham (Witham) appeals from the judgments entered in the Superior

Court pursuant to jury verdicts finding her guilty of arson (Class A), 17–A M.R.S.A. § 802 (1983 & Supp.1996), and three counts of false swearing (Class D), 17–A M.R.S.A. § 452 (1983 & Supp.1996), (Piscataquis County, Mead, J.). Witham contends that the trial court abused its discretion by admitting in evidence out-of-court statements in violation of M.R.Evid. 802; that the court committed reversible error by allowing in evidence certain State's exhibits in violation of M.R.Evid. 401, 403; that the delay in the filing of the trial transcripts constitutes a deprivation of due process, U.S. Const. amend. XIV, § 1; and that there was insufficient evidence to support her convictions for false swearing.[1] Although we agree that the court erred in admitting one of the out-of-court statements, we conclude that the error was harmless. We disagree with Witham's other contentions and affirm the judgment.

*Background*

[¶ 2] The evidence presented to the jury established these facts. In September 1990 Ruth Witham resided with her three children and a foster child at 14 Willow Street in Milo, Maine, a house which she had purchased in the early 1980s. The home was insured for $50,000. Witham's mother also had a home in Milo, on Park Street, with a first mortgage of $17,000 from a local credit union and a second mortgage of $4,500 from a bank.

[¶ 3] On her mother's death in 1990, Witham attempted to buy the Park Street property after finding out about a default on the first mortgage loan, but was unable to secure a loan due to delinquent credit. The credit union loan officer, Ricky Moore (Moore), testified that during the week of September 6, 1990, after Witham's loan application was denied, she threatened that if the credit union foreclosed on the Park Street house she would make the process "long and expensive" for it.

[¶ 4] At the trial, Janice Sprandel Carter (Carter),[2] a Witham family friend and the roommate of Susan Goodine (Goodine), Witham's mother-in-law and close friend, testified to having overheard conversations in the summer of 1990 between Witham and Goodine in which Witham said that she wanted her mother's home, was upset about not being able to obtain it, and claimed she was going to "get [it] ... the same way she [had got the one] on the Lyford Road."[3] Carter testified that within the month prior to the fire, she had witnessed Witham backing in her van next to Goodine's trailer home once or twice a day, but that she could not see what, if anything, Witham was unloading at the trailer's back door. Several of Ruth Witham's relatives, friends, and neighbors testified about the removal and disappearance of the family's pets (including dogs, parrots, rabbits, and cats) within days or weeks prior to the fire. Joyce Renee Witham, the defendant's former sister-in-law and current next-door neighbor, testified that Goodine telephoned her on the evening of September 4, 1990, at approximately 6:30 p.m., and whispered, "move the vehicles out of the door yard or on the further side of the house because Mike and Ruthie's house was going up tonight."

[¶ 5] That same evening, Ruth Witham came home from work to the Willow Street residence at 5:00–6:00 p.m., took her foster child to her mother-in-law's home,[4] and took

1. The appellant does not challenge the sufficiency of the evidence to support her conviction of arson; therefore, we address the sufficiency of the evidence for the false swearing convictions only.

2. In the record, Janice Sprandel Carter is referred to alternately as "Sprandel" and "Carter." She testified to her preference for "Carter."

3. On the record before us, the fate of the house on Lyford Road remains a mystery. There was testimony at the trial about whether Witham truthfully answered the insurance agents' questions about "prior losses" when she took out

insurance on the Willow Street home. An insurance agent could not remember how the question was asked and whether she stipulated a particular period of time, and Witham denied ever having been asked the question. Eventually, the defense objected to further questioning on this issue, reminding the trial court that both sides had been trying to avoid the topic "the entire trial." The court sustained the objection.

4. Ruth Witham's explanation for not leaving her 16–year–old foster daughter at home alone the night of the fire, while she and her other children visited their father, was that she feared for her safety given a death threat Witham had received

her three children to visit their father. That visit ended at about 8:30 p.m. Witham and her children returned to Milo and found their home in flames. The fire had been reported to the authorities at 8:15 p.m. by a neighbor who later testified that he had seen no one in the vicinity of the home at the time. Joyce Renee Witham testified that when she called Goodine to let her know Ruth Witham's house was on fire, Goodine did not seem surprised. Carter, who was in the room when Goodine received the call, testified that she appeared "[v]ery calm [and exhibited] no shock."

[¶ 6] According to Witham, the fire destroyed "basically" everything in her home. Fire Marshall Stewart Jacobs, after investigating the scene of the fire, ruled out accidental causes and concluded that the fire had been started by a "time delay device" with "an accelerant" and "combustibles," such as toilet paper and paper towels, that were placed inside a freezer chest in the basement.[5] Witham's expert witness agreed that the fire had been "done professionally." Almost immediately after the fire, Witham contacted Moore and told him that she intended to use the insurance recovery from the Willow Street fire to purchase her mother's Park Street home. Carter testified that she overheard Ruth Witham tell Jeff Goodine[6] during the winter after the fire that "when she got her money, he would get his."

[¶ 7] On February 12, 1991, the defendant was deposed in connection with her insurance claim. During the deposition there were references to a 16–page inventory of items that allegedly had been destroyed or lost in the fire (admitted at the trial as State's Exhibit 30). Witham admitted during the deposition that she had removed some items from the Willow Street residence after the fire but did not mention specifically her washer and dryer. In addition, she claimed

that she had removed nothing from the house prior to the fire. The deposition was read in evidence at the trial.

[¶ 8] The next day, February 13, Milo Chief of Police Todd Lyford (Lyford) and Fire Marshall Office Investigator James Ellis (Ellis) executed search warrants at the trailer home of Goodine, at what was left of the Willow Street residence of Witham, and at the Park Street residence of Witham's mother. The search of the Goodine home yielded a white cardboard box, State's Exhibit 22, found in front of the trailer, which contained numerous family photographs and other possessions belonging to Witham. Lyford testified that during his search of the Goodine home, Witham tried to grab a stereo that was there and leave with it. Lyford's search of the Willow Street garage, next to the fire damaged house, yielded a bag of approximately 40 hats, which Roberta Moulton (Moulton) testified she had seen in the house prior to the fire. Both the hats and the stereo were listed on the inventory. While searching the Park Street home, Ellis testified that he found the same fire-damaged washer and dryer he had seen in the Willow Street home when he had inspected the premises after the fire in September 1990. At the time, Witham admitted to Ellis that she had taken the washer and dryer from the Willow Street home, but said nothing about when.

[¶ 9] In June 1991 Witham was indicted on four counts of false swearing (Counts I–IV) and one count (Count V) of arson. Specifically, Witham was charged with false swearing for having asserted during her deposition that no contents had been removed from the Willow Street home after the fire (Count I), that no pictures had been removed from the home prior to the fire (Count II), that nothing had been removed prior to the

---

recently. Witham reported the threat and gave the answering-machine tape of it to the Milo Police. She testified that at around the same time there were several break-ins at the Willow Street house.

5. Jacobs explained that a "time delay device is commonly used by a fire setter to do a couple of things; one, to conceal the actual ignition of the fire, and ... to allow the fire setter to be quite a

distance away from the building at the time that the fire breaks out." In this case, the device seems to have consisted of a "candle ... [which eventually burned] down and [ignited] the accelerant and the combustibles...."

6. Carter described Jeff Goodine as "actually not [Susan Goodine's] son, but somebody she takes care of."

fire (Count III), and that when she filled out her application for the insurance policy the agent never asked her whether she had suffered fires in the past (Count IV). Witham entered a not guilty plea to the charges and was tried by a jury in January 1993. At the trial, Witham denied responsibility for the fire, and claimed that many of the exhibits found in places outside her home had not been there prior to the fire. Pursuant to the defendant's motion for acquittal of all charges at the close of the evidence, the trial court acquitted Witham of the false swearing count involving her assertion that the insurance agent never asked her about past fires when she filled out her insurance application. The jury found Witham guilty of the remaining counts. Witham was sentenced on June 8, 1993, with execution stayed pending appeal. The court reporter did not file the trial transcript necessary for the appeal until January 1996, and the defendant did not receive a copy of it until the following month.

### Discussion

*Admissibility of Out–of–Court Statements*

▪ [¶ 10] We review the court's evidentiary rulings for clear error and an abuse of discretion, *Hatch v. Maine Tank Co.*, 666 A.2d 90, 95 (Me.1995). Whether proffered evidence is relevant is determined pursuant to the clear error standard. *State v. Philbrick*, 669 A.2d 152, 155 (Me.1995). Admissibility decisions are left to the sound discretion of the trial court because such questions often require the court to balance the probative value of the evidence against such factors as unfair prejudice, confusion of issues, and cumulativeness. *State v. Case*, 672 A.2d 586, 588 (Me.1996); see also M.R.Evid. 403.

▪ [¶ 11] Witham contends that the court committed reversible error by admitting two out-of-court statements in violation of the hearsay rule. See M.R.Evid. 802. First, Witham challenges the court's admission of Carter's testimony about conversations she overheard between Goodine and the defendant, in which the defendant explained how she was going to obtain the home her

mother owned at the time of her death. Carter testified that "[Ruth Witham] wanted the home and she was upset because she hadn't gotten it.... One day in the early summer she ... come [sic] into Susan Goodine's trailer and said she was going to get the home. And Susan asked her how, and she said the same way she [had got the one] on the Lyford Road."

[¶ 12] Carter's testimony about Ruth Witham's comments to Goodine involves classic party-opponent admissions[7] that are excluded from the hearsay rule by definition. M.R.Evid. 801(d)(2)(A) ("A statement is not hearsay if ... [t]he statement is offered against a party and is ... his own statement...."); *State v. Anaya*, 456 A.2d 1255, 1265 (Me.1983); *State v. Burnham*, 350 A.2d 577, 580 (Me.1976). The court did not err in admitting Carter's statement.

▪ [¶ 13] The second statement at issue is Joyce Renee Witham's testimony that Goodine had whispered to her, during a telephone conversation on the evening of the fire, "move the vehicles out of the dooryard or on the further side of the house because Mike and Ruthie's house was going up tonight." The State's purpose in eliciting this testimony is revealed by the following colloquy at sidebar:

> The State: ... But if this person hears another person merely saying that, "Mike and Ruthie's house is going to go up, you better move your cars," that is not necessarily hearsay. And I'm not offering it for the truth of the matter. In fact, it is a future fact.
>
> The Court: *Showing knowledge on the part of the client [Ruth Witham].*
>
> The State: Right, and the fact that it was said by this witness—by Sue Goodine.
>
> Defendant: How does that *get back to the client?*
>
> The State: *Well, I've already showed that.*
>
> Defendant: Showing they have a confidential relationship?

---

7. The reference to "admissions" in the Rules of Evidence is somewhat misleading. A statement of a criminal defendant need not be inculpatory to qualify as an admission pursuant to this rule. See Field & Murray, Maine Evidence § 801.5 at 8–19.1 (3d ed. 1994).

The State: *Plus* I've already showed you what the proffered evidence is going to be. (Emphases added.) The State wanted the jury to conclude that Susan Goodine, close friend and confidante of the defendant Ruth Witham, knew that "Mike and Ruthie's house was going up tonight" because Ruth Witham told her of her plan to commit arson. Although the State argues that Joyce Renee Witham's testimony simply permits the jury to infer that Goodine acquired her knowledge of Ruth Witham's plan to burn her home from Ruth Witham, and hence Joyce Renee Witham's testimony was admissible as circumstantial evidence of a relevant fact, we disagree. The court should have excluded Joyce Renee Witham's testimony about her conversation with Susan Goodine as impermissible hearsay.

[¶ 14] M.R.Evid. 805 states: "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these Rules." Joyce Renee Witham's testimony consists of combined statements. The first one is the explicit statement from Susan Goodine to Joyce Renee Witham: ". . . move the vehicles out of the dooryard or on the further side of the house because Mike and Ruthie's house was going up tonight." The second one is the implicit statement from Ruth Witham to Susan Goodine: 'I know this because Ruth told me that she is going to burn her house tonight.' The combined statements are being offered to prove a single truth—namely, that Ruth Witham admitted her arson plan to Susan Goodine. Although the second statement is an admission, and hence technically not hearsay,[8] that admission is included by inference within the explicit statement of Susan Goodine to Joyce Renee Witham. That explicit statement does not fall within any exception to the hearsay rule.

[¶ 15] Although the State argues that this explicit statement from Goodine to Joyce Renee Witham is not hearsay because it is not being offered to prove the truth of the matter asserted in the statement—namely, that there was in fact a fire at Ruth Witham's

house—the State's argument is misleading. The truth asserted is actually the admission of Ruth Witham contained in the combined statements. Since the explicit statement of Susan Goodine to Joyce Renee Witham does not fall within any exception to the hearsay rule, the combined statements do not meet the requirement that each part of the combined statements must conform to an exception to the hearsay rule. M.R.Evid. 805. The court therefore should have excluded Joyce Renee Witham's testimony as impermissible hearsay.

[¶ 16] We conclude, however, that the admission of Joyce Renee Witham's testimony was harmless error. The expert witnesses for the State and the defendant agreed that the fire that destroyed Ruth Witham's residence was of deliberate origin. Ruth Witham's conduct in the weeks and days before the fire suggested that she was removing items from her residence in anticipation of a fire. She made incriminating statements in the presence of witnesses suggesting a motive for causing the fire and obtaining the insurance proceeds. Independent of the testimony of Joyce Renee Witham that should have been excluded, there was admissible testimony by both Joyce Renee Witham and by Carter that Goodine was not surprised or shocked when Joyce Renee Witham called Goodine to report that Ruth Witham's house was on fire. Under these circumstances, we find that "it is highly probable that the error did not affect the jury's verdict," *State v. Phillipo,* 623 A.2d 1265, 1268 (Me.1993); *State v. True,* 438 A.2d 460, 467 (Me.1981).

*Admissibility of Exhibits & Convictions for False Swearing*

[¶ 17] Contrary to Witham's contentions, the trial court did not abuse its discretion in admitting State's Exhibits 22 (and the exhibits it contained) and 30. They were relevant and were more probative than prejudicial, see *State v. Spearin,* 477 A.2d 1147, 1155 (Me.1984); *State v. Spearin,* 463 A.2d 727, 730–31 (Me.1983); *State v. Leath-*

---

8. M.R.Evid. 801(d)(2) states in pertinent part: "A statement is not hearsay if: . . . The statement is offered against a party and is (A) his own statement, . . . ."

*ers,* 407 A.2d 15, 16–17 (Me.1979). The trial judge also gave an appropriate instruction on the limited evidentiary purpose of the inventory (State's Exhibit 30). See M.R.Evid. 105; see also *State v. Giovanini,* 567 A.2d 1345, 1347 (Me.1989) (limiting instructions not objected to at trial reviewed under obvious error standard for such inadequacy as to deny fair trial). Finally, there was sufficient evidence to support Witham's convictions for false swearing. *State v. Harper,* 675 A.2d 495, 497 (Me.1996) (weight to be given to the evidence and determinations of witness credibility are exclusive province of the factfinder).

### Delay in Filing of the Transcript

[10] [¶ 18] Witham contends that the nearly 31–month delay in the filing of the trial transcript for this appeal is sufficient to constitute a deprivation of due process, U.S. Const. amend. XIV, § 1, under the criteria we articulated in *State v. Harper:* " '(1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired.' " 675 A.2d 495, 498 (Me.1996) (quoting *Rheuark v. Shaw,* 628 F.2d 297, 303 n. 8 (5th Cir.1980), cert. denied, 450 U.S. 931, 101 S.Ct. 1392, 67 L.Ed.2d 365 (1981)). In *Harper,* we were presented with a 30–month transcript filing delay and found that although the defendant may have experienced anxiety over the outcome of his appeal, the delay did not prejudice his rights given the appeal's lack of merit. 675 A.2d at 498.

[¶ 19] Although we recognize that a 30–month or greater delay in filing trial transcripts for an appeal may work a deprivation of due process, Witham points to no prejudice to her rights other than the inevitable effect of the passage of time on the memories and availability of the witnesses for both parties.[9] *State v. Fowler,* 676 A.2d 43, 45–46

(Me.1996); *see U.S. v. Luciano–Mosquera,* 63 F.3d 1142, 1158 (1st Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1879, 135 L.Ed.2d 174 (1996) ("The defendant must show prejudice. Whether an appellate delay results in prejudice sufficient to warrant reversing a conviction rests, most importantly, on a showing that it has impaired the appeal or the defense in the event of retrial." (citation omitted)). Witham was not incarcerated during the pendency of her appeal. She made no effort to obtain the transcript in a more timely fashion. See *Fowler,* 676 A.2d at 45. Finally, as the balance of this opinion demonstrates, we find no other basis for vacating the convictions. See *Harper,* 675 A.2d at 498 (citing *United States v. Johnson,* 732 F.2d 379, 382–83 (4th Cir.), cert. denied, 469 U.S. 1033, 105 S.Ct. 505, 83 L.Ed.2d 396 (1984)). Therefore, we conclude that the delay in filing the trial transcript was not sufficiently prejudicial to constitute a deprivation of due process.

Accordingly, the entry is:

Judgments affirmed.

---

9. Our assertion that a "thirty month delay in furnishing the trial transcripts is presumptively prejudicial," in *State v. Harper,* 675 A.2d 495, 498 (Me.1996), was not intended to suggest that the burden of proof on a lack of prejudice there-

by shifts to the State. Indeed, in *Harper* itself we held that there was no deprivation of due process on grounds that "[the defendant] has not demonstrated prejudice as a result of the delay." *Id.*